BRANNON, *alias* HARDWALK, *v.* THE STATE.

No. 12609. APRIL 11, 1939.

*M. G. Hicks* and *W. T. Maddox,* for plaintiff in error.

*M. J. Yeomans, attorney-general, J. Ralph Rosser, solicitor-general, J. S. Crawford, E. J. Clower,* and *H. E. Smith,* contra.

REID, Chief Justice. Robert Lee Brannon, alias Hardwalk, was convicted of the murder of his wife, Bessie Brannon. The jury made no recommendation for mercy, and the defendant was sentenced to be electrocuted. His motion for new trial was overruled, and he excepted.

The evidence introduced by the State made out substantially the following case: On December 24, 1930, the defendant was in the city jail or stockade at Rome, where he was "serving time . . for fighting with his wife." As was the custom of the police authorities of that city, the defendant and other prisoners in the jail or stockade were released from custody about four o'clock in the afternoon on the above date, so that they might spend Christmas at home. In less than an hour after he was released, the police authorities received a call from the defendant's wife informing them

that the defendant "had gotten home and was threatening to kill her," and asking that they send after him. Shortly thereafter she made another and similar call to the authorities. In response to these calls the authorities made a search for the defendant, but did not apprehend him. Just before the homicide, which appears to have occurred about eight or nine o'clock on the same evening, the defendant appeared at the house and demanded of the deceased, in abusive and threatening language, that she unlock the door and let him in, or else he would break the door down. Their two sons were in the room with her on this occasion, and at her request the older boy immediately left the house by way of the back door, so that he would not become involved in any altercation with the defendant. The younger son, who was then about six years old, remained and witnessed the events which culminated in the homicide. At the trial his testimony was in material part as follows:

"I remember when my mother got killed, don't remember the year, I think it was about eight years ago. I am now fourteen years old, and I was six when she got killed. I know the defendant. He killed my mother—Hardwalk, who is sitting by Mr. Hicks. His full name is Robert Lee Brannon. There was not anybody in the house but me when he killed my mother, just my mother, Hardwalk, and me. He had that knife when he came to the house, and he pushed the door down and came in and went to arguing. Honey [the elder son] was in there, and she told him to go out the back door and go to work, and then she started out the house, and got to the doorsteps, and he came out and knocked her, my mother, off of the doorsteps at the front, hitting her with his hand, with his fist, and she fell to the ground. She got up and ran down to Mrs. Webb's house, across the street, and Hardwalk followed her. He didn't say nothing to me. I was behind him, and she ran to Mrs. Webb's house and knocked on the door, and Mrs. Webb wasn't down there, and he went down there and grabbed her and cut her and drug her to the schoolhouse and cut her throat, and then he told her . . then I said, Mr. Hardwalk, don't kill my mother, and he says, 'Shut up, I will cut your G——d—— throat,' and I ran up to Mr. Sugarfoot's house. He cut my mother two times, with a knife, cut her right along here where I indicated on myself, the left breast, over her heart, and when he got her down there he cut her throat. . . I don't remember how long she lived

before she died. I ran up to Mr. Sugarfoot's house and I told him, and he got . . Mr. Jim Wright, and Arthur Davis, and they came down there, and somebody went and called Dozier's ambulance. After Hardwalk cut my mother he put her under the schoolhouse steps, and Mr. Jim Wright and Arthur Davis found her, and somebody called the ambulance. My mother didn't do anything to Hardwalk, draw a razor or knife or shotgun on him. She had called the city hall and told them she didn't want him any more. . . My mother was running from Hardwalk at the time he cut her. One day a little before he killed her, at dinnertime he put some glass in the beans to kill us. . . I was at home the night Hardwalk came and started breaking the door down, was in the room with my mother. When Hardwalk broke down the door I didn't go anywhere. I stayed there, and they went to cursing. He drug her to the schoolhouse before he killed her, from Mrs. Webb's, the blind woman's house, who lived down in front of our house. I don't know how far that is from our house, and don't have any idea. The schoolhouse is not a block away from where the blind woman lives, a little piece down below our house. I didn't run when they started to fight and curse, didn't run at all. When he carried her and put her under the schoolhouse, he then said he was going to kill me, and I ran to Mr. Sugarfoot's house, a white man, a block away." The defendant's statement consisted merely of a denial of the homicide, stating that he "caught a freight . . and went to Chattanooga" the night the homicide occurred.

The State, by way of rebuttal, introduced witnesses who testified that they saw the defendant at and near the scene of the crime about the time of its commission. Some of these witnesses stated that he was brandishing a knife, running about near deceased's house, and inquiring if any one had seen her.

■ The verdict was amply authorized by the evidence. In the motion for new trial error is assigned because the judge failed to charge the jury the law concerning the offense of voluntary manslaughter as related to mutual combat. "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea

■

of deliberation or malice, either express or implied." Code, § 26-1007. Under this section it has been held that "If, upon a sudden quarrel, the parties fight upon the spot, or presently agree and fetch their weapons and fight, and one of them is killed, such killing is but voluntary manslaughter, no matter who strikes the first blow." *Gann* v. *State,* 30 *Ga.* 67; *Carulhes* v. *State,* 95 *Ga.* 343 (22 S. E. 837); *Ray* v. *State,* 15 *Ga.* 223; *Tate* v. *State,* 46 *Ga.* 148, 157; *Gresham* v. *Equitable Accident Insurance Co.,* 87 *Ga.* 497 (13 S. E. 752, 13 L. R. A. 838, 27 Am. St. R. 263); *Hart* v. *State,* 135 *Ga.* 356 (69 S. E. 530); *Buchanan* v. *State,* 153 *Ga.* 866 (113 *Ga.* 87); *Ison* v. *State,* 154 *Ga.* 408 (114 S. E. 351); *Clark* v. *State,* 6 *Ga. App.* 741 (65 S. E. 694); *Eich* v. *State,* 169 *Ga.* 425 (150 S. E. 579); *Johnson* v. *State,* 173 *Ga.* 734, 742 (161 S. E. 590). See *Sheffield* v. *State,* 188 *Ga.* 1 (2 S. E. 2d, 657). Mutual combat exists where there is a fight and both parties are willing to fight. *Harris* v. *State,* 184 *Ga.* 382, 390 (191 S. E. 439). "A mutual intention to fight need not be proved directly, but may be inferred by the jury from the conduct of the parties." *Sapp* v. *State,* 2 *Ga. App.* 449 (58 S. E. 667). "Being suddenly aroused by anger, and mutually intending to fight, the law of mutual combat is involved. Such combat sufficiently appears where it is shown that there was a mutual intent by the accused and deceased to fight, and one or more shots were fired. It makes no difference who fires the first shot, nor is it necessary that both parties shoot." *Johnson* v. *State,* supra. So also where one or more blows are passed, where weapons other than pistols are used. If there be any facts or circumstances tending to show mutual combat or mutual intention to fight, the court should give in charge to the jury the law of combat as related to voluntary manslaughter. *Waller* v. *State,* 100 *Ga.* 320 (28 S. E. 77); *Dorsey* v. *State,* 110 *Ga.* 331 (35 S. E. 651); *Hart* v. *State,* supra; *Clements* v. *State,* 140 *Ga.* 165 (78 S. E. 716); *Higgs* v. *State,* 148 *Ga.* 136 (95 S. E. 994); *Little* v. *State,* 150 *Ga.* 728 (105 S. E. 359).

Counsel for the defendant plant their claim that the judge should have charged the jury upon the law of voluntary manslaughter as related to mutual combat solely upon statements taken from the testimony of the deceased's younger son, as follows: "When Hardwalk broke down the door I didn't go anywhere. I stayed there, and they went to cursing . . I did not run when they started to fight and

curse, didn't run at all." These excerpts by no means tell the story of the homicide as related by this witness, as a casual perusal of his testimony quoted above will readily disclose; and we can not agree that this evidence required a charge on the theory of mutual combat, under the principles above stated. The evidence does not disclose an intent to fight on the part of the deceased, but on the other hand shows an effort by her, up to the moment of her death, to avoid combat with the defendant. The defendant had threatened the deceased before the events which immediately resulted in the homicide, and she had thereupon sought the protection of the police authorities. Thereafter the defendant appeared at the house with a knife in his hand, and upon being refused admittance by the deceased he forced the door open. It is true that the witness described the parties' conduct at this point as "fighting and cursing," but it appears that the deceased was not armed, and that after the defendant entered the house she immediately fled to the house of a neighbor, and was pursued and finally slain by the defendant. Upon a fair consideration of the evidence as a whole, it does not appear directly or by inference that the deceased, aroused by anger upon sudden provocation, willingly engaged in any combat with the defendant. The judge did not err in omitting to charge on this subject.

■ It appears that after the jurors had entered upon their deliberation of the case, they returned to the court-room and the foreman made the following statement to the court: "There is some question in some of the minds of the jury as to whether or not we can recommend him to the mercy of the court, and the court would use some way whereby he would have to serve his sentence." To this statement the court made the following reply: "The court can not; all the jury can do is to find a verdict which they believe to be the truth, and the court can pronounce formal sentence under this verdict. That is all, you say?" Foreman: "Yes, sir." In the motion for new trial complaint is made of the above response by the judge, it being contended that he should have charged the jury in that connection as follows: "I charge you that the court can not by his order, or in any other manner, force a convicted person to serve the sentence imposed; that is a question entirely under the jurisdiction of the Parole Board and the Governor of Georgia, but I do charge you that the presumption of law and fact

is that the defendant will serve the sentence imposed on him by your verdict." There is no merit in this ground. The judge, of course, was without power to regulate the sentence after it was once imposed, and he correctly instructed the jury as to the basis upon which their verdict should rest. It was not within their province to govern the sentence given in conformity to their verdict. The court having already fully instructed the jury on their power to recommend mercy and thus to fix the sentence to be imposed on the defendant, the instruction here complained of was fair and complete, and there was no error in failing to charge in the language and form contended for. The court did not err in overruling the motion for new trial. *Judgment affirmed. All the Justices concur.*