CONE *v.* THE STATE.

No. 13931.   JANUARY 22, 1942.   REHEARING DENIED FEBRUARY 13, 1942.

*A. J. Whitehurst* and *Clifford E. Hay,* for plaintiff in error.

*Ellis G. Arnall, attorney-general, George R. Lilly, solicitor-general, E. J. Clower* and *C. E. Gregory, assistant attorneys-general,* contra.

BELL, Justice. █ There is no insistence on the general grounds of the motion for new trial. The amendment to the motion contained six additional grounds, which are insisted on, and will be referred to herein according to the numbering in the amendment.

In ground 1 it is contended that the judge erred in failing to charge the jury on justifiable homicide and voluntary manslaughter. Attached to this ground is a brief of a part of the evidence, in virtue of which it is contended a charge on voluntary manslaughter as related to mutual combat should in any event have been given. There is no merit in this ground. None of the evidence tended

to show justifiable homicide, and therefore the failure of the court to charge the jury on that subject was not erroneous. *Benjamin* v. *State,* 150 *Ga.* 78 (2) (102 S. E. 427); *Turner* v. *State,* 190 *Ga.* 316 (9 S. E. 2d, 270).

As to voluntary manslaughter, the only question for determination is whether a charge on this subject should have been given on the theory that the killing was the result of a mutual combat. The evidence pertinent to this contention may be summarized as follows: About the middle of the afternoon the deceased was seen at or near his home, when he was "drunk" and had an ax-handle, with which he stated he was going to kill Howard Cone, or "beat hell out of him," signifying as a reason that he and the defendant had had a fight, and that the defendant "tore his shirt off of him." The defendant was not present at this time. Later during the afternoon the deceased and the defendant were seen together at the home of the former, "inside the house, laughing, talking, and joking," apparently in good humor and friendly. At a still later hour, about 7:30 in the afternoon, they passed the house of a neighbor, and were quarreling. At this time they appeared to be drinking, and were "rather loud and boisterous," "talking loud and rough." They returned then to the home of the deceased, after which there was a noise in the house as the report of "a shotgun, and after that a chair fell. . . It sounded like the house was tearing down." Some "mumbling voices" were heard, but the witness who heard them could not tell "what was being said." At the time of his arrest the defendant stated to the arresting officer that "they were fighting in the kitchen, and got over that fight and settled that, and went in and laid down on the bed, and said they got to arguing again, and he took his knife and cut his throat first and then cut his head off." It appears that at the coroner's inquest he made the following statement: "It is done done now, and I can't help it. We had a fight after we went to the negro house. We were fighting, and I cut his throat first. I don't remember who started the scrap. He was not asleep on the bed. We were fighting, we started in the kitchen. He did not have a knife when I killed him, so far as I know." On the night of the homicide and before his arrest, the defendant was seen by an acquaintance, in the road about two hundred yards from the home of the deceased. The person who saw him at this

·time, testified that he stated that he was in serious trouble and wanted witness "to get the law," that he had "killed Roy Tucker."

The foregoing evidence did not tend to show a mutual combat, and hence would not have authorized a charge on voluntary manslaughter as related to such theory. In order to reduce a homicide from murder to voluntary manslaughter, on the theory of mutual combat, it should affirmatively appear that at the time of the homicide both parties were in position and manifested an intention to fight. *Cornelious* v. *State,* 193 *Ga.* 25 (17 S. E. 2d, 156, 158). The unlawful killing of one who has given the slayer no provocation other than the use of words, threats, menaces, or contemptuous gestures can not be graded as voluntary manslaughter under the doctrine of mutual combat. Code, § 26-1007; *Bird* v. *State,* 128 *Ga.* 253 (57 S. E. 320). While it appears that the deceased, a few hours before he was killed, had an ax-handle with which, as he stated, he intended to kill or beat the defendant, there was no evidence that this threat was ever communicated to ·the defendant, or that the deceased made any effort whatever to carry it into effect. He stated at the time that he and the defendant had had a fight, and that the defendant had torn his ·shirt off; but the circumstances of such fight were never revealed by any one. Moreover, the defendant and the deceased were later seen together "laughing, talking, and joking," apparently in good humor and friendly. At this time, therefore, there was nothing to indicate "hot blood" arising from mutual combat. *Brown* v. *State,* 144 *Ga.* 216 (87 S. E. 4). Later, however, they were boisterous and quarreling; and according to extrajudicial statements of the defendant they were fighting or had been fighting at the time of· the homicide.· But these additional facts, considered either by themselves or in connection with the other evidence, do not show·mutual combat within the meaning of the law as related to voluntary manslaughter. On proof of a killing without evidence of justification or mitigation, the burden is shifted to the defendant to establish some defense. *Futch* v. *State,* 90 *Ga.* 472 (8) (15 S. E. 102); *Mann* v. *State,* 124 *Ga.* 760 (53 S. E. 324, 4 L. R. A. (N. S.) 934); *Warren* v. *State,* 140 *Ga.* 227 (78 S. E. 836). The mere fact that there was a previous quarrel and fight did not, without more, establish mutual intent to fight. *Tate* v. *State,* 46 *Ga.* 148; *Ison* v. *State,* 154 *Ga.* 408 (114 S. E. 351);

*Harris* v. *State,* 184 *Ga.* 382, 391 (191 S. E. 439). For aught that appears, everything that was said or done by the deceased might have been wholly defensive, except his threat, which so far as shown he at no time attempted to execute. Under the evidence, even if the fight had occurred in a public place and if Tucker had lived, he could not have been convicted of an affray; and unless the fight in such case would have amounted to an affray, there was no mutual combat. Code, § 26-5303; *Tate* v. *State,* 46 *Ga.* 148; *Gresham* v. *Equitable Accident Insurance Co.,* 87 *Ga.* 497, 503 (13 S. E. 752, 27 Am. St. R. 263).

Upon a fair consideration of the evidence as a whole, it does not appear, directly or by inference, that the deceased willingly engaged in any combat with the defendant. Therefore the judge did not err in failing to charge on voluntary manslaughter as related to mutual combat. *Griggs* v. *State,* 148 *Ga.* 211 (4) (96 S. E. 262); *Brannon* v. *State,* 188 *Ga.* 15 (2 S. E. 2d, 654); *Mims* v. *State,* 188 *Ga.* 702 (7) (4 S. E. 2d, 831); *Roberts* v. *State,* 189 *Ga.* 36 (3) (5 S. E. 2d, 340).

It appears from the record that the defendant made the following statement at the coroner's inquest: "It is done done now, and I can't help it. We had a fight after we went to the negro house. We were fighting, and I cut his throat first. I don't remember who started the scrap. He was not asleep on the bed. We were fighting; we started in the kitchen. He did not have a knife when I killed him, so far as I know." The statement was reduced to writing by some one. At the request of the defendant's attorney, it was read in evidence by C. M. Dixon, sheriff, who testified as a witness for the State. Thereafter the defendant's counsel offered the writing itself in evidence. The court at first sustained an objection by the solicitor-general, on the ground that it was "a self-serving declaration," but later re and stated: "The coroner's inquest proceedings as to C statement are admitted in evidence as part of the defendant's fession." In ground 2 it is contended by movant that said r and language were erroneous, for the following reasons: (a) statement of the accused, being extrajudicial in nature, should been admitted in evidence as a whole, and should have been cepted or rejected by the jury as a whole. (b) Two witnesses the State, the sheriff and the deputy sheriff, having testified

from having heard the spoken words of the defendant in his statement at the coroner's inquest they had no recollection of any reference therein to a fight after a visit to a negro house, the said documentary record of the contents of said statement should have been admitted in evidence for whatever legitimate purpose it might have served, especially for the purpose of rebutting the testimony of the State's witnesses, and for the further purpose of showing the entire statement, leaving the jury, under proper instructions from the court, to determine all material facts in point. (c) The jury should have been permitted to consider the documentary evidence of the statement, as well as the oral testimony regarding the same, and particularly those parts of the evidence which the movant insisted tended to show mutual combat, for the purpose of determining whether the alleged homicide was murder or voluntary manslaughter. (d) The language of the court admitting such written statement in evidence "as a part of the defendant's confession" was an intimation by the court that a confession had been proved. (e) By restricting the jury's right to consider said document only as a part of the defendant's confession, the court invaded the province of the jury to determine the weight and credit to be given by them to the evidence then and there before them.

There is no merit in any of these contentions. The statement of the judge was, as a matter of law, a correct characterization of the defendant's statement at the coroner's inquest; that is to say, the statement of the defendant was in effect a confession, since it admitted the killing and did not show any circumstances of justification or mitigation, and, as shown in authorities cited above mutual combat, the mere statement that he and the deceased had been fighting did not show that the deceased entered willingly into the fight or did so otherwise than as a matter of defense. There was evidence of still other statements freely and voluntarily made by the defendant, amounting to confessions, and evidence of no statement indicating justification or mitigation. If the defendant admits the killing and in the same connection states reasons moving him to commit the homicide, and the reasons given are insufficient to show any justification or mitigation, the statement amounts to a confession. *Jones* v. *State,* 130 *Ga.* 274 (4) (60 S. E. 740); *Minter* v. *State,* 158 *Ga.* 127, 132 (123 S. E. 23);

*Daniel* v. *State,* 187 *Ga.* 411 (4), 413 (1 S. E. 2d, 6). In the circumstances the statement by the judge in admitting the document was not cause for a new trial. *Taylor* v. *State,* 135 *Ga.* 622 (8) (70 S. E. 237); *McCloud* v. *State,* 166 *Ga.* 536 (3) (143 S. E. 558); *Lyles* v. *State,* 130 *Ga.* 294 (6) (60 S. E. 578). In this view, it is unnecessary to determine whether, if the defendant felt aggrieved by the statement of the judge, he should have objected to it at the time it was made, without waiting to complain for the first time in a motion for new trial. Compare *Moore* v. *McAfee,* 151 *Ga.* 270 (2) (106 S. E. 274); *Armstrong* v. *State,* 181 *Ga.* 538 (2) (183 S. E. 67); *Mickle* v. *Moore,* 193 *Ga.* 150 (17 S. E. 2d, 728); *Parker* v. *Wellons,* 43 *Ga. App.* 721, 727 (160 S. E. 109).

■ In ground 3 it is stated: "During the trial and while witnesses were being examined and cross-examined by defendant's counsel, questions were asked for the purpose of showing that the reputation and character of the deceased for violence was bad. Upon objection of the solicitor-general, on the ground that the deceased was not shown to have made the assault, and no foundation had been laid for such testimony, the court sustained the objection and excluded the evidence." It appeared that counsel afterward moved the court for permission "to introduce witnesses for the purpose. of showing that the reputation and character of the deceased for violence was bad." The court again ruled that such evidence was inadmissible; and each of these rulings was assigned as error.

It is contended by counsel for the State that this ground of the motion is fatally defective, because it does not show that any pertinent question was asked, or that any particular testimony was excluded, so as to authorize a complaint that the right of cross-examination was infringed, or that any evidence was illegally withheld. See *Smith* v. *Smith,* 133 *Ga.* 170 (65 S. E. 414); *Barron* v. *Barron,* 185 *Ga.* 346 (194 S. E. 905); *Petty* v. *Bryant,* 188 *Ga.* 102 (2 S. E. 2d, 910). However this may be, it is true, as further insisted by the State, that evidence as to the character of the deceased for violence would not have been admissible, since there was no evidence to show that the deceased was the assailant and that the defendant was seeking to defend himself. *Doyal* v. *State,* 70 *Ga.* 134 (5 a); *Drake* v. *State,* 75 *Ga.* 413 (3), 415; *Gardner* v. *State,* 90 *Ga.* 310 (17 S. E. 86, 35 Am. St. R. 202); *Barnett* v.

*State,* 136 *Ga.* 65 (5) (70 S. E. 868); *Fulch* v. *State,* 137 *Ga.* 75 (5) (72 S. E. 911); *Crawley* v. *State,* 137 *Ga.* 777 (2) (74 S. E. 537); *Brooks* v. *State,* 150 *Ga.* 732 (3) (105 S. E. 362); *Johnson* v. *State,* 192 *Ga.* 571 (15 S. E. 2d, 786). This ruling accords with the decisions in *Monroe* v. *State,* 5 *Ga.* 85 (4), and *Pound* v. *State,* 43 *Ga.* 88, 128, cited for the plaintiff in error.

■ Grounds 4 and 5 assign error on different excerpts from the charge of the court. In order that these grounds may be properly understood and considered, it would seem that the excerpts complained of should be viewed together and in the light of their context, as may be done from the extract next quoted. The part of the following quotation which is enclosed in *parentheses* was assigned as error in ground 5, while that enclosed in *brackets* was complained of in ground 4:

"I now define to you the law of murder: Murder is the unlawful killing of a human being, in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either express or implied. In its commission is involved a killing not authorized by law, and such killing must have been by a person of sound memory and discretion. The law presumes every person to be of sound mind, until the contrary appears. To constitute this offense, the killing must have been done with malice aforethought.

" (Malice is a state of the mind, and intention to kill under such circumstances as the law does not justify nor in any degree excuse if the killing occurs as intended. You will see from this that there must be a deliberate purpose to take human life; the mind must be made up to act; it must have arrived at the conclusion to kill; but it is not necessary that the deliberate intention to take life should exist for any particular length of time before the killing. If it enters the mind of the slayer the moment before he inflicts the mortal wound, that is sufficient. If it is deliberate, intentional, at the time he makes up his mind to kill; if it exists only that length of time, it is sufficient in law. A man may form the intention to kill, do the killing instantly, and regret the deed as soon as done. Legal malice is not necessarily ill-will or hatred; it is an unlawful intention to kill, without justification or excuse.)

"Malice may be either express or implied. It is express when it is manifested by external circumstances capable of proof. When

the deliberate purpose to take life exists, and when this is shown by external circumstances capable of proof, the jury may find express malice. Preparation for the act of killing, lying in wait, threats to kill, and matters of that character, may be some of the evidences tending to show express malice.

"Malice may also exist although there may be no evidence of express malice; it is then implied. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart. An abandoned and malignant heart, in the sense of the law, is commonly held to be evinced by a weapon or other appliance likely to produce death, and by brutal and bloodthirsty use of such instrumentality.

"[Malice is implied from a deliberate act, however sudden. In this connection I charge you this: A man who can voluntarily shoot or stab is capable of entertaining and acting from malice, unless he can plead some infirmity besides drunkenness. To be too drunk to attempt to kill, he must be too drunk to cut or stab. Intent to kill is only necessary to amount to legal malice.] The law provides that drunkenness shall not be an excuse for any crime or misdemeanor, unless such drunkenness was involuntary,—that is, caused by the fraud or contrivance of another person, against the will of the person on trial, and then the person causing such drunkenness and wrongful act shall himself be considered a principal and suffer the consequences of the crime or misdemeanor he thus causes to be committed if he is shown to have been possessed of sound reason and discretion."

In ground 4 the portion of the foregoing charge which is shown in brackets was assigned as error on the following grounds: "(a) The concluding sentence that 'Intent to kill is only necessary to amount to legal malice,' makes every intentional killing malicious even if done in self-defense or under circumstances which the law denounces only as voluntary manslaughter. It excludes all matter of mitigation from the consideration of the jury, and, in effect, excludes from their consideration that part of the evidence indicated by Exhibit A hereto annexed as a part of this amendment [including the evidence substantially stated in the first division of this opinion]. Considered in connection with other parts of the charge on malice, it was confusing to the jury. (b) The state-

ments therein with reference to ability to 'shoot or stab' and 'attempt to kill' are argumentative and are incorrect statements of law; and the connected words, 'unless he can plead some infirmity besides drunkenness,' amounts to an intimation by the court to the jury that the accused was pleading drunkenness as a defense, which he was not doing, and tended to confuse the jury. (c) Said concluding sentence also excluded deliberation as the essence of malice."

As will be seen from these exceptions, there is no attack upon the first sentence of the excerpt, stating that "Malice is implied from a deliberate act, however sudden." Accordingly, no question as to whether this statement should have used the word "killing" for "act" and should have included the word "unlawful" after "deliberate" or was otherwise objectionable, will be determined. Compare *Braswell* v. *State,* 42 *Ga.* 609 (3), 613; *Goolsby* v. *State,* 147 *Ga.* 169 (93 S. E. 88). The remainder of the excerpt was evidently given in reference to drunkenness, and must have been so understood by the jury. It is almost a reproduction of the language of this court in *Marshall* v. *State,* 59 *Ga.* 154, 156, where it was said: "A man who can voluntarily shoot is capable of malice, unless he can plead some infirmity besides drunkenness. To be too drunk to form the intent to kill, he must be too drunk to form the intent to shoot. And intent to kill is the only necessary ingredient of legal malice, where neither justification nor adequate provocation is made to appear." While the last sentence of the excerpt, "Intent to kill is only necessary to amount to legal malice," may not have been as full and clear as the similar statement in the *Marshall* case, yet in view of the *entire charge,* it was not cause for a new trial on the theory, as contended, that it excluded deliberation as the essence of malice, and made every killing malicious, even if done in self-defense or in circumstances such as would reduce the homicide from murder to voluntary manslaughter.

The charge was not argumentative, as contended, nor under the facts of the record did it constitute reversible error because of the words "unless he can plead some other infirmity besides drunkenness." It was insisted by the movant that this latter charge was erroneous as containing an intimation that he had pleaded drunkenness as a defense when he had not done so. The evidence was sufficient to show that the defendant was drunk on the occasion in

question. He made no statement at the trial. The charge was in the abstract, and was manifestly intended as an instruction that voluntary drunkenness is no excuse for crime. In the circumstances the exception is without substantial merit. Code, § 26-403; *Dickens* v. *State,* 137 *Ga.* 523 (5), 529 (73 S. E. 826); *Daniel* v. *State,* 171 *Ga.* 335 (2), 340 (155 S. E. 478); *Haden* v. *State,* 176 *Ga.* 304 (9), 310 (168 S. E. 272); *Yaughan* v. *State,* 26 *Ga. App.* 639 (107 S. E. 389).

■ To avoid repetition, reference is here made to that portion of the charge which is enclosed in parentheses in the rather lengthy quotation contained in the preceding division. The excerpt which may be thus identified was assigned as error in ground 5 of the motion, the exceptions being as follows: (a) The definitions of malice contained in the first and last sentences thereof were contradictory and confusing: (b) the statement in the last sentence, defining malice as the unlawful intention to kill without justification or excuse, was incorrect and prejudicial, for the reasons (1) it excluded all idea of passion such as would reduce the offense to voluntary manslaughter; (2) it expressly excluded from the jury mitigating circumstances inferable from that part of the evidence on which the defendant relied as indicating voluntary manslaughter as related to mutual combat, the evidence being identified; (3) it eliminated the effect of the extra-judicial statements shown to have been made by the accused, and (4) the court thereby invaded the province of the jury to determine from all the evidence whether the killing was murder or voluntary manslaughter.

We are unable to perceive any substantial conflict in the definitions of malice in this excerpt; certainly there was no *material* conflict as related concretely to the evidence adduced. As shown in the preceding division, the judge defined murder and malice, express and implied, substantially in the language of the Code, §§ 26-1003; 26-1004. In *Leonard* v. *State,* 133 *Ga.* 435 (66 S. E. 251), it was held that after the court defined murder and express and implied malice in the language of the Code, it furnished no ground for reversal to add, "it [meaning malice] is an unlawful intention to kill without justification or mitigation." It is argued in the brief that the charge here under consideration eliminated all idea of deliberation or premeditation; but when it is considered as a whole it is not subject to this criticism. Immediately after the

first definition of malice as contained in the excerpt, the judge told the jury, "You will see from this that there must be a deliberate purpose to take human life; the mind must be made up to act, it must have arrived at the conclusion to kill." In *Goosby* v. *State*, 153 *Ga.* 496 (4) (112 S. E. 467), a charge similar to that here under review was held substantially correct. To the same effect, see *DuPre* v. *State*, 153 *Ga.* 798 (3) (113 S. E. 428).

It is further contended, however, that since the charge did not refer to mitigation, it excluded the theory of voluntary manslaughter as related to mutual combat. There is no merit in this contention. In *Mann* v. *State*, 124 *Ga.* 760 (supra), a charge in almost the identical language was assigned as error as excluding mitigation and thereby eliminating the theory of voluntary manslaughter. It was held that the words "nor to any degree excuse" should be held by contrast to refer to mitigation; and that the charge as given conveyed the meaning that malice is the intent to take human life in cases where the law neither mitigates nor justifies. The decision in the *Mann* case has been followed in several later cases. *Worley* v. *State*, 136 *Ga.* 231 (2) (71 S. E. 153); *Smith* v. *State*, 140 *Ga.* 791 (2) (79 S. E. 1127); *Wilson* v. *State*, 152 *Ga.* 337 (2), 341 (110 S. E. 8); *Mincey* v. *State*, 187 *Ga.* 281 (2) (200 S. E. 144).

Of the cases relied on by counsel for the plaintiff in error in this connection, although all have been carefully studied, only *Curry* v. *State*, 150 *Ga.* 736 (105 S. E. 361), and *Vincent* v. *State*, 153 *Ga.* 278 (6) (112 S. E. 120), would seem to require specific mention. In the *Curry* case, where three grades of homicide, murder, *voluntary manslaughter*, and justifiable homicide, were involved, it was held that the charge, "malice in law is the unlawful intent to take human life; that is all it is," was erroneous and required a new trial, in that it prevented the jury from finding the defendant guilty of the lesser offense of voluntary manslaughter, since in that offense the killing is both unlawful and intentional, and yet not malicious, within the meaning of the latter term as applied to the crime of murder. In the *Vincent* case, a charge to the effect that "legal malice is the intent unlawfully to take away the life of a human being" was held inaccurate and erroneous, as it excluded deliberation or premeditation, which is the gist of murder. In neither of these cases was there any such

full and complete definition of malice as was given in the case now under consideration. The charge here, when considered as a whole, clearly *embraced* the element of deliberation, and did not *exclude* the idea of mitigation. Moreover, as shown in the first division, there was no basis for a charge on mitigation. The excerpt complained of was not erroneous for any reason assigned.

What has been stated in this division should be considered with the discussion contained in division 4, as the grounds of the motion dealt with in the two divisions are closely related.

■ In ground 6 the movant complained of instructions on insanity and drunkenness, contending that they were so blended as to make the charge as a whole confusing on these subjects; that they so contrasted the opposing contentions of counsel that they in effect made the charge as a whole an argument in favor of the State's contention that the defendant was drunk but not insane at the time of the homicide, and impaired if they did not utterly destroy the defense of insanity; and that, especially in view of a designated excerpt, the several charges when considered together authorized the jury to return a verdict of guilty if they found that the defendant committed the homicide while in a state of temporary drunkenness, regardless of what his mental condition might otherwise have been. When the excerpts complained of are considered together and in the light of other instructions, especially those later given, in which the judge distinguished between temporary voluntary drunkenness, and permanent mental impairment amounting to insanity, though brought about by the use of intoxicants, it is clearly apparent that the exceptions taken are without merit.

Upon a careful examination of the entire record we are convinced that no reversible error was committed. The judgment refusing a new trial must be *Affirmed. All the Justices concur.*